No. 23-20171

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**DISABILITY RIGHTS TEXAS,**
**Plaintiff-Appellee,**

v.

**ROY HOLLIS, in his official capacity as the Chief Executive Officer of**
**Houston Behavioral Healthcare Hospital, LLC,**
**Defendant-Appellant.**

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division
Civil Action No. 4:22-cv-121

**BRIEF OF *AMICI CURIAE* DISABILITY AND MENTAL HEALTH**
**ADVOCACY ORGANIZATIONS**

**IN SUPPORT OF PLAINTIFF--APPELLEE**

Mark Whitburn
Texas Bar No. 24042144
Sean Pevsner
Texas Bar No. 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Ste. 600
Arlington, Texas 76006
Tel: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that in addition to the persons and entities listed in the Appellant's and Appellee's Certificates of Interested Persons, the following persons and entities have an interest in the outcome of the case under Rule 28.2.  These representations are made so judges may evaluate potential recusal.

*Amici Curiae*

Mental Health America of Greater Dallas
NAMI Texas
The National Association for Rights Protection and Advocacy ("NARPA")
Texas Jail Project
The Texas Council for Developmental Disabilities

*Counsel for Amici Curiae*

Mark Whitburn
Sean Pevsner
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
(817) 653-4547
mwhitburn@whitburnpevsner.com
spevsner@whitburnpevsner.com

# TABLE OF CONTENTS

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**................. i

**TABLE OF CONTENTS** ................................................................................ ii

**TABLE OF AUTHORITIES** ...................................................................... iii

**INTERESTS OF AMICI CURIAE** .......................................................... iv

**INTRODUCTION**.............................................................................................1

**ARGUMENT** ....................................................................................................2

   **A.  The Amici Curiae Are Contacted Frequently by Individuals with Mental Illness Who Allege Impermissible Involuntary Medication by Staff at Psychiatric Facilities.** ...........................................................2

   **B.  The Amici Curiae Uniformly Refer Such Allegations to DRTx for Possible Investigation.** ...........................................................................5

   **C.  In Referring Such Allegations to DRTx for Possible Investigation, the Amici Curiae Rely on DRTx to Have Access to the Information Necessary to Conduct the Investigation Appropriately.**.......................7

   **D.  The Amici Curiae Refer Relevant Allegations to DRTx with the Recognition that Investigation of Abuses Against One Patient at a Psychiatric Facility Will Likely Benefit Other Patients As Well.** ..................10

   **E.  The Amici Curiae Further Recognize That the Value of Providing Appropriate and Necessary Investigative Tools to DRTx Far Outweighs Any Conceivable Confidentiality Considerations for the Patients.** ............12

**CERTIFICATE OF SERVICE** .......................................................................14

**CERTIFICATE OF COMPLIANCE** .............................................................14

# TABLE OF AUTHORITIES

## STATUTES AND REGULATIONS

42 U.S.C. § 10801, *et seq*…………………………………………………………..6

42 U.S.C. § 10805(1)(A). …………………………………………...……………6

Texas Health & Safety Code § 576.008………………………………………6

# INTERESTS OF AMICI CURIAE

**Mental Health America of Greater Dallas**' ("MHA-Dallas") work is driven by its commitment to promote mental health as a critical part of overall wellness, including prevention services for all; early identification and intervention for those at risk; integrated care, services, and supports for those who need them; with recovery as the goal. MHA-Dallas has served the Dallas/Ft. Worth area mental health community for 75 years.  MHA-Dallas has an interest in this matter because it supports effective, accessible mental health treatment for all people who need it and believe in the individual rights and the opportunity to care for their own treatment.

**NAMI Texas** is a 501(c)(3) nonprofit organization founded by volunteers in 1984. NAMI Texas is affiliated with the National Alliance on Mental Illness (NAMI) and has 25 local affiliates throughout Texas.  NAMI Texas has nearly 2,000 members made up of individuals living with mental illness, family members, friends, and professionals. Its purpose is to help improve the lives of people affected by mental illness through education, support, and advocacy.  NAMI Texas is dedicated to improving the quality of life of all individuals living with mental illness and their families, including those who find themselves in psychiatric facilities or jails. NAMI Texas is interested in this matter because of the implications that the

Court's decision will have on the health and safety of justice-involved individuals living with mental illness.

**The National Association for Rights Protection and Advocacy** ("NARPA") was formed in 1981 to provide support and education for advocates working in the mental health arena. It monitors developing trends in mental health law and identifies systemic issues and alternative strategies in mental health service delivery on a national scale. Members are attorneys, people with psychiatric histories, mental health professionals and administrators, academics, and non-legal advocates -- with many people in roles that overlap. Central to NARPA's mission is the promotion of those policies and strategies that represent the preferred options of people who have been diagnosed with mental disabilities. Approximately 40% of NARPA's members are current or former patients of the mental health system. NARPA members were key advocates for the passage of Federal legislation such as the Americans with Disabilities Act (ADA) (42 U.S.C. §§ 12101 et seq.), the ADA Amendments Act of 2008 (ADAAA) (Pub. L. 110-325), and the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act of 1986 (42 U.S.C. §§ 10801-51). NARPA has submitted amicus briefs in many cases in federal and state courts in cases affecting the lives of persons with psychiatric disabilities. This case is important to NARPA because the access authority of the Protection

and Advocacy systems under PAIMI is fundamental to their ability to protect the rights of people with psychiatric disabilities.

**The Texas Council for Developmental Disabilities** is one of 56 state councils created by federal law in 1970. As updated in the Developmental Disabilities Assistance and Bill of Rights Act of 2000, P.L. 106-402, Councils are established to "engage in advocacy, capacity building, and systemic change activities" to promote "self-determination, independence, productivity, and integration and inclusion in all facets of community life" for individuals with developmental disabilities.  TCDD is governed by 27 Governor-appointed board members, 60 percent of whom are individuals with developmental disabilities or family members of individuals with disabilities. The specific mission of the Texas Council for Developmental Disabilities is to "create change so that all people with disabilities are fully included in their communities and exercise control over their own lives."  The Texas Council for Developmental Disabilities has an interest in this matter because abuse and neglect of individuals with mental illness in psychiatric facilities and elsewhere threatens the ability of such individuals to exercise appropriate control over their own lives. The Texas Council for Developmental Disabilities is also interested in this matter because some people with mental illness also have developmental disabilities, experience

communications difficulties, and have been shown to be subjected to abuse and neglect more frequently than others.

**Texas Jail Project** is an organization whose mission is "to liberate communities by organizing with, and advocating for, people incarcerated in Texas county jails and their loved ones."  Because a high percentage of people incarcerated in Texas and nationally are individuals with mental illness, Texas Jail Project is heavily involved in advocating for the rights of such individuals.  With such individuals frequently waiting in Texas jails who may wait "in jail up to 600 days for a psychiatric hospital bed,"  prolonged advocacy may often be required.  Texas Jail Project has an interest in this matter because the outcome of this Court's decision affects  not only the ability of DRTx to protect the rights of individuals with mental illness in the jails, but also in the psychiatric facilities in which they may ultimately find themselves.

# INTRODUCTION

G.S. complained to Disability Rights Texas ("DRTx") in August 2021 that Houston Behavioral Healthcare Hospital, LLC ("Houston Behavioral") staff members had involuntarily administered psychoactive medication to him with no court order or medication-related emergency that could justify such an administration under Tex. Health & Safety Code § 576.025.  DRTx opened an investigation and, after it narrowed the range of dates and times in which these involuntary medication administrations were alleged to have occurred, requested video records corresponding to those dates and times.  Defendant refused to produce such records, citing in part the need to protect the privacy rights of other patients who appear in the video footage.  The amici curiae who present this brief to the Court advocate for the interests of individuals with mental illness, including the alleged victim of abuse and other patients who might have been hospitalized in Defendant's facility as well.  For the reasons explained below, the amici curiae uniformly support DRTx's efforts to obtain the video footage necessary to further its investigation.

1

# ARGUMENT

**A.      The Amici Curiae Are Contacted Frequently by Individuals with Mental Illness Who Allege Impermissible Involuntary Medication by Staff at Psychiatric Facilities.**

As explained above, the amici curiae are uniformly organizations who advocate on behalf of individuals with mental illness.  As recounted below, in many cases the organizations are led by individuals who identify themselves as such individuals themselves.  Each of the amici curiae organizations has a strong interest in the correction of abuses against individuals with mental illness in psychiatric facilities and each fields complaints of such abuse routinely.

MHA-Dallas' work is driven by its commitment to promote mental health as a critical part of overall wellness, including prevention services for all; early identification and intervention for those at risk; integrated care, services, and supports for those who need them; with recovery as the goal.[1]  MHA-Dallas has served the Dallas/Ft. Worth area mental health community for 75 years.[2]  Through the course of its work, MHA-Dallas is frequently contacted by individuals with mental illness who allege violations of their rights in psychiatric facilities or similar settings.

---

[1] https://mhadallas.org/
[2] https://mhadallas.org/history/

NAMI Texas,[3] the Texas affiliate of NAMI, has "nearly 2,000 members made up of individuals living with mental illness, family members, friends, and professionals."[4]  With 25 local affiliates throughout Texas, its "purpose is to help improve the lives of people affected by mental illness through education, support, and advocacy."[5]  In line with this express purpose, NAMI Texas receives an estimated minimum of fifty contacts every year from individuals who claim to have had their rights violated in psychiatric facilities.

The mission of the National Alliance for Rights Protection and Advocacy is "to support people with psychiatric diagnoses to exercise their legal and human rights with the goals of abolishing forced treatment and ensuring autonomy, dignity and choice."[6]  NARPA was formed in 1980 by advocates seeking to impact mental health services for affected individuals.[7]  With respect to its own Board of Directors, it takes as its goal "to ensure meaningful and significant representation on the Board of people who self-identify as consumers/survivors/ex-patients, or who state they have been psychiatrically labeled."[8]  In line with the goal embedded

---

[3] From its foundation in 1979 until its name was legally changed in 1997 to the acronym itself, NAMI stood for National Alliance for Mental Illness.  *See* https://namitexas.org/about-nami-texas.

[4] https://namitexas.org/about-nami-texas.

[5] *Id*.

[6] *See* narpa.org.

[7] *See* www.narpa.org/reference/mental-health-advocacy-from-then-to-now.

[8] Narpa.org/about

in its mission statement of abolishing forced treatment, NARPA is frequently contacted by individuals with mental illness who have undergone forced treatment in psychiatric facilities, given that such difficulties continue to exist.[9]

The Texas Council for Developmental Disabilities is one of 56 state councils created by federal law in 1970. As updated in the Developmental Disabilities Assistance and Bill of Rights Act of 2000, P.L. 106-402 (the "DD Act"),[10] Councils are established to "engage in advocacy, capacity building, and systemic change activities" to promote "self-determination, independence, productivity, and integration and inclusion in all facets of community life" for individuals with developmental disabilities.[11]  DD Act, at Section 101(b) and (b)(1).  The Texas Council for Developmental Disabilities is frequently contacted by individuals whom it refers to DRTx for possible investigation of violations of federal and state laws protecting people with disabilities. The Council has also advocated at the Legislature on behalf of individuals who are dually-diagnosed with developmental disabilities and mental health issues, including on issues related to the involuntary provision of psychoactive medications to patients.

---

[9] *See* www.narpa.org/reference/mental-health-advocacy-from-then-to-now.

[10] *See* https://tcdd.texas.gov/about-us/mission-and-purpose.

[11] Developmental disabilities can include mental illnesses.  *See* DD Act, at Section 102(8).

Texas Jail Project is an organization whose mission is "to liberate communities by organizing with, and advocating for, people incarcerated in Texas county jails and their loved ones."[12]  Texas Jail Project notes the plight of individuals with disabilities in Texas jails who may wait "in jail up to 600 days for a psychiatric hospital bed."[13]  Such individuals may die in jail even after a judge has ordered them transferred to a psychiatric facility.[14]  In some Texas counties, as many as forty percent or more of jail inmates may have mental illnesses, consistent with national statistics.[15]  Thus, Texas Jail Project considers it critical that such individuals have the protections they require both while in jail and in psychiatric facilities if and when they are transferred.  Texas Jail Project receives many reports each year of abuse, in which such protections have allegedly broken down.

**B.    The Amici Curiae Uniformly Refer Such Allegations to DRTx for Possible Investigation.**

Despite the fact that, as described in Section A above, the amici curiae are deeply interested in and committed to the rights of individuals with mental illness and that they are frequently contacted by individuals complaining that their rights were violated in psychiatric facilities, including through forced medication, they

---

[12] https://www.texasjailproject.org/about-texas-jail-project.

[13] Texasjailproject.org.

[14] *See, e.g.*, https://www.keranews.org/criminal-justice/2023-08-14/tarrant-county-inmates-unnecessary-death-spotlights-mental-health-crisis-in-jails-nationwide

[15] *Id.*

are not investigatory agencies capable of acting on these complaints themselves. Instead, they uniformly refer such complaints to DRTx, the Protection and Advocacy organization for the State of Texas.

After all, Congress expressly indicated that a Protection and Advocacy organization created through the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq*., would "have the authority to . . . investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred[.]" 42 U.S.C. § 10805(1)(A). Thus, federal law expressly contemplates that an organization such as DRTx would receive reports of abuse and investigate them.

Moreover, the Texas legislature also contemplated that DRTx would take on an investigatory role and, therefore, facilitated the reporting of incidents of abuse and neglect to that organization. In Texas Health & Safety Code § 576.008, the state legislature mandated that "[a] patient [at a mental health facility] shall be informed, in writing, at the time of admission and discharge, of the existence, purpose, telephone number, and address of the protection and advocacy system established in this state under the federal Protection and Advocacy for Mentally Ill Individuals Act of 1986 (42 U.S.C. Sec. 10801, et seq.)." Thus, the Texas legislature took express measures to enhance the ability of DRTx to receive reports

6

of abuse or neglect from patients at psychiatric facilities.  The legislature would have had no reason to adopt such measures if it did not contemplate that DRTx would act on those reports to protect the rights of the individuals at issue.

Thus, in referring allegations by individuals with mental illness of abuse at psychiatric facilities to DRTx, the amici curiae follow the path created and reinforced by both federal and state law.

## C.    In Referring Such Allegations to DRTx for Possible Investigation, the Amici Curiae Rely on DRTx to Have Access to the Information Necessary to Conduct the Investigation Appropriately.

As explained in Section B above, the amici curiae cannot and do not act on complaints of abuse of individuals with mental illness at psychiatric facilities, but uniformly refer such complaints to DRTx.  Such referrals will have no positive impact, however, if DRTx lacks access to the information necessary to conduct the investigation appropriately.

As DRTx itself notes in its Brief of Appellee, at 9, mere access to the written records in the case of G.S. was insufficient for DRTx to make the necessary determinations as to the course and outcome of its  investigation.  This is unsurprising, as wrongdoers would not likely voluntarily document their wrongdoing.  Furthermore, as here, wrongdoers frequently resist requests for the most relevant evidence on grounds almost identical to the grounds put forward by Defendant in this matter.  Charged with investigative functions in connection with

Texas jails, the Texas Commission on Jail Standards in its 2019 Self Evaluation

Report,[16] at 86, complained as follows:

> Several times per year, the agency will encounter opposition when
> requesting inmate medical records.  This most often occurs when dealing
> with a facility that utilizes a contract medical provider.  Other situations in
> which this has been an issue is when a facility is using a contract provider
> for mental health services.  When this occurs, the provider most often cites
> HIPAA as the reason for their reluctance or refusal to provide access.
> . . . When [this situation] is encountered, it slows down the process of trying
> to determine if there were any violations of minimum standards in an
> extremely important area.  Failure to provide adequate healthcare can have
> dire consequences, up to and including death.  . . . Current state law and the
> federal act regarding disclosure of medical records provides an exemption
> that we have been able to utilize in the past when this issue arises.  However,
> there is still opposition as entities misinterpret (intentionally or due to lack
> of knowledge) this exemption and slow down the resolution of complaints
> and investigations.

DRTx faces precisely this same kind of obstructionism in its efforts to investigate

the allegations of abuse here.

Furthermore, it is often more difficult for individuals with mental illness to

provide the requisite information on their own behalf.  Individuals with mental

illness are not always taken sufficiently seriously as witnesses.  For example, in the

Journal of the American Academy of Psychiatry and the Law, *Testimony by*

*Mentally Ill Individuals*, September 2008,[17] the author recounts an incident in

which a young patient in a psychotic state "described to his attending physician

---

[16] https://www.sunset.texas.gov/public/uploads/files/reports/Texas%20
Commission%20on%20Jail%20Standards%20SER.pdf.
[17] https://jaapl.org/content/36/3/393

that before his admission he was in psychological care, and the psychologist was nude when treating him." The attending physician reported this to his department head, but dismissed the report as a fantastical product of his patient's psychosis. *Id*. The department head was less sure, given the repeated and consistent manner in which the patient made the report, and followed up. *Id*. Ultimately, "there was an investigation that proved the credibility of the complaint via a recording." *Id*. Investigators or courts may take special measures to obtain witness statements or testimony from individuals with mental illness.[18] However, not all tribunals make use of such measures, making it that much more critical that investigators have the tools they need to gather corroborating evidence.[19]

---

[18] *See, e.g.*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4967784.

[19] Other characteristics typical of some mental illnesses can affect perceived credibility as well. As but one example, individuals with schizophrenia may have a flat affect or the relative absence of emotional display in facial expressions and the like. *See, e.g.*, https://www.webmd.com/mental-health/flat-affect. Facial expressions can constitute a key mechanism for understanding nonverbal communication and thus in grasping the full import of a witness' statement or testimony. *See, e.g.*, A Forensic Psychologist's Guide to Body Language, available at forensicscolleges.com/blog/resources/forensic-psychologists-guide-to-body-language#:~:text=1%20Lowering%20and%20drawing%20together%20of%20brows%2C%20often,Dilated%20nostrils%206%20Jutting%20of%20the%20lower%2.

**D.     The Amici Curiae Refer Relevant Allegations to DRTx with the Recognition that Investigation of Abuses Against One Patient at a Psychiatric Facility Will Likely Benefit Other Patients As Well.**

If DRTx investigates reported abuses by a psychiatric facility, the benefits of such an investigation can extend well beyond the alleged victim of the particular abuses reported.  If staff members at a facility abuse one patient, they may well abuse others as well.  If the abuse of one patient is reported and effectively investigated, other individuals with mental illness at the same facility may be less likely to face similar abuses.  In fact, the benefits may extend even to other facilities if the results of the investigation become widely known.

The amici curiae recognize that, for every instance of reported abuse, including  forced medication, many other instances go unreported.[20]  In its 2011 Evaluation of the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Program (the "PAIMI Evaluation"),[21] at 13, the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services

---

[20] Even in recent years, psychiatric facilities in Texas have reportedly engaged in rampant abuse, allegedly going so far in one instance as to hold patients against their will even in the face of court orders for their release.  *See, e.g.*, https://www.wfaa.com/article/news/local/investigates/texas-psych-hospitals-hold-voluntary-patients-mental-health-against-their-will-complaints-show/287-956cb7b7-d75c-4f06-a2c7-2f49f35cdfe5; https://www.headlinersfoundation.org/showcase-awards/2019/4/27/mental-health-crisis-held-hostage-amp-abused-in-texas-hospitals; https://www.houstonchronicle.com/news/investigations/in-crisis/article/Texas-has-shut-down-one-psychiatric-hospital-16271793.php

[21] *See* https://store.samhsa.gov/sites/default/files/d7/priv/pep12-evalpaimi.pdf

Administration, Center for Mental Health Services, provided the following

anecdote as representative:

> A parent whose teenager had been placed in a residential program in the
> community said, "The individuals that need the PAIMI services are not
> aware of the program.  There were several kids at the place that were being
> abused.  While our son had parents to advocate for him, no other kid had
> parents to advocate.  They are mostly foster kids and wards of the state and
> foster kids are powerless. . . . While the facility's director had the right
> message, and staff toe the line while he's present, once he is not around the
> abuse and neglect and mistreatment occurs."

Under such circumstances, investigative work by a Protection and Advocacy

organization such as DRTx concerning abuses alleged by one individual must

inevitably benefit the others as well.  In line with this proposition, the PAIMI

Evaluation further noted an example of the investigation of one PAIMI program

into the death of a man with schizophrenia who had been hospitalized for nearly 14

months and left inappropriately in a seclusion room.  PAIMI Evaluation, at 13-14.

The investigation led to a variety of policy changes at the facility.  *Id*.  *See also id.*,

at 14 ("It is estimated that one in five adults in the United States will receive

treatment for a mental health condition at some point in their lives.  For those

adults and children receiving care from the public mental health system, the PAIMI

Program is typically their only resource for rights protection and advocacy.")

In light of the critical role of the PAIMI Programs in the investigative

process, "Congress has shown specific interest in the ability of state PAIMI

Programs to investigate [the arbitrary use of mechanical and chemical restraint and

11

seclusion techniques].”  PAIMI Evaluation, at 22.  The Protection and Advocacy organizations charged with carrying out such functions thus play a critical role not only in investigating allegations of abuse and neglect by particular individuals with mental illness, but also in investigating the general use of certain techniques and practices in hospitals and psychiatric facilities generally.

**E.     The Amici Curiae Further Recognize That the Value of Providing Appropriate and Necessary Investigative Tools to DRTx Far Outweighs Any Conceivable Confidentiality Considerations for the Patients.**

In light of the critical role played by Protection and Advocacy organizations, such as DRTx, in investigating both individual instances and general patterns and practices of abuse and neglect, the amici curiae recognize that the value of providing appropriate and necessary investigative tools to such organizations far outweighs any conceivable confidentiality considerations for patients who may not themselves have triggered the investigations through their own reports.  After all, as DRTx explains in its Brief of Appellee, at 8, such organizations are required under federal law to maintain the confidentiality of any patients.

Furthermore, the stakes for individuals with mental illness in psychiatric facilities are immeasurably high.  News organizations have reported for years on the drastic abuses in Texas psychiatric facilities as a result of which patients have committed suicide, been imprisoned against their will, been overmedicated, been threatened with needles, and been severely injured as a result of abuse and neglect.

*See, e.g.*, "Mental Health  Crisis: Held Hostage & Abused in Texas Hospitals," KTVT, September 27, 2018;[22] "How Texas fails the mentally ill," by Alex Stuckey, Houston Chronicle, February 25, 2021.[23]  Similar problems exist in Texas jails.  *See, e.g.*, "KERA: Tarrant County Inmate's 'Unnecessary Death' Spotlights Mental Health Crisis in Jails Nationwide," Texas Jail Project, August 14, 2023.[24] DRTx plays a critical role in combating these abuses, as contemplated by Congress, the Texas legislature, advocates, and the amici curiae here.  It must be provided the tools it requires to play this role effectively.

Dated:  October 2, 2023                    Respectfully Submitted,

                                              /s/ Mark Whitburn
                                          Mark Whitburn
                                          Texas Bar No. 24042144
                                          Sean Pevsner
                                          Texas Bar No. 24079130
                                          Whitburn & Pevsner, PLLC
                                          2000 E. Lamar Blvd., Suite 600
                                          Arlington, Texas 76006
                                          Tel: (817) 653-4547
                                          Fax: (817) 653-4477
                                          mwhitburn@whitburnpevsner.com

---

[22] https://www.headlinersfoundation.org/showcase-awards/2019/4/27/mental-health-crisis-held-hostage-amp-abused-in-texas-hospitals.

[23] https://www.houstonchronicle.com/news/investigations/article/In-Crisis-How-Texas-cuts-fails-mentally-ill-Texans-15966617.php.

[24] https://www.texasjailproject.org/2023/08/kera-tarrant-county-inmates-unnecessary-death-spotlights-mental-health-crisis-in-jails-nationwide.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on counsel of record for the parties through the Electronic Filing Service on October 2, 2023, as follows:

Beth Mitchell
Courtney Luther
Disability Rights Texas
2222 West Braker Lane
Austin, Texas 78758

Attorneys for Plaintiff/Appellee

Sophia M. George
Jeffrey T. Nobles
Husch Blackwell LLP
600 Travis Street, Suite 2350
Houston, Texas 77002

Attorneys for Defendant/Appellant

_____/s/ Mark Whitburn_____

## CERTIFICATE OF COMPLIANCE

I hereby certify that: (1) this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 2,756 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and (2) this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

in a 14-point Times New Roman font in the text.

_____/s/ Mark Whitburn_____